**Slip Op. 05-126**

# UNITED STATES COURT OF INTERNATIONAL TRADE

HEBEI METALS & MINERALS IMPORT & EXPORT CORPORATION AND HEBEI WUXIN METALS & MINERALS TRADING CO., LTD.,

                    Plaintiffs,

                    v.

UNITED STATES,

                    Defendant.

Before: Restani, Chief Judge

Court No. 03-00442

## OPINION

[Results of Commerce's Second Remand Redetermination Regarding Surrogate Value for Coal in Non-Market Economy Anti-Dumping Duty Margin Calculation Sustained.]

                    Dated: September 22, 2005

        Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, (Bruce M. Mitchell, Mark E. Pardo, and Paul G. Figueroa) for plaintiff.

        Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (David S. Silverbrand), Philip Curtin, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

**RESTANI, Chief Judge:**

        This litigation began with Plaintiffs Hebei Metals & Minerals Import & Export Corporation and

Hebei Wuxin Metals & Minerals Trading Co., Ltd. (referred to collectively hereinafter as "Hebei")

challenging three surrogate values used by the United States Department of Commerce ("Commerce" or "the Department") in calculating the antidumping duty margin for lawn and garden steel fence posts from the People's Republic of China ("PRC"). See Hebei Metals & Minerals Imp. & Exp. Corp. v. United States, Slip Op. 04-88 (Ct. Int'l Trade July 19, 2004) [hereinafter Hebei Metals I]. After the court's review of Commerce's first remand determination, only one surrogate value remained at issue: Commerce's use of Indian import statistics data, rather than the domestic data advocated by Hebei, to value coal used in drying the subject fence posts' coating. See Hebei Metals & Minerals Imp. & Exp. Corp. v. United States, 366 F. Supp. 2d 1264 (Ct. Int'l Trade 2005) [hereinafter Hebei Metals II]. Because neither party could cite record evidence to make the selection of a surrogate coal value more than a speculative choice, Hebei Metals II ordered Commerce to re-open the record in order to obtain information that would support a surrogate coal value and to adhere to its conditional preference for domestic surrogate data in reaching its decision. Id., 366 F. Supp. 2d at 1276–77.[1]

The results of Commerce's inquiry are now before the court. See Final Results of Redetermination Pursuant to Remand, Hebei Metals & Minerals Imp. & Exp. Corp. and Hebei Wuxin Metals & Minerals Trading Co., Ltd. v. United States (Dep't Commerce July 20, 2005) [hereinafter "Second Remand

---

[1] The court assumes familiarity with Hebei Metals I and Hebei Metals II. Hebei Metals I reviewed the margin calculations made in Final Determination of Sales at Less Than Fair Value: Lawn and Garden Fence Posts from the People's Republic of China, 68 Fed. Reg. 20,373 (Dep't Commerce April 25, 2003) [hereinafter Final Determination], and explained in Decision Memorandum for the Final Determination of the Antidumping Duty Investigation of Lawn and Garden Steel Fence Posts from the People's Republic of China (Dep't Commerce April 18, 2003), P.R. 158, Pls.' App., Ex. 2.

Determination"].  In the <u>Second Remand Determination</u>, Commerce used Indian domestic price data to value coal instead of the Indian import statistics it used previously.  Commerce tried unsuccessfully to obtain information from Hebei regarding the type of coal used in the production of the subject fence posts and found that Hebei failed to cooperate by not acting to the best of its ability in responding to its requests for information.  <u>Second Remand Determ.</u> at 17.  On this basis and pursuant to 19 U.S.C. § 1677e(b) (2000), Commerce applied adverse facts available ("AFA") in selecting from the Indian domestic price data on the record.  <u>Id.</u> at 17.  Hebei challenges the application of AFA, arguing—for the first time in this litigation—that information pertaining to the coal factor of production constitutes "very minor data" that it should not be expected to have.  <u>See</u> Hebei Comments on Second Remand at 9.  Hebei also seeks Rule 11 sanctions against the Government on the basis of alleged harassment and unnecessary delay.  <u>See</u> Fed. R. Civ. P. 11.  Because Commerce properly applied AFA and did not violate Rule 11, the <u>Second Remand Determination</u> is affirmed.

## BACKGROUND

Commerce prepared the <u>Second Remand Determination</u> in response to <u>Hebei Metals II</u>, which provided the following remand instructions:

> On remand, Commerce shall re-open the record to add evidence. Commerce may add any relevant evidence, but it must either:
>
> (1)    seek evidence of the type of coal used by Hebei in its production process, and non-aberrational price data that best relates to this coal type, if the record does not already contain such data; or, if that is deemed impractical at this stage,
>
> (2)    obtain evidence of the type or types of coal normally used for drying steel fence posts in China or India and non-aberrational price data that        b e s t

relates to such coal type(s), if the record does not already contain            such data.

In either scenario, Commerce shall adhere to its conditional preference for domestic surrogate data or Commerce shall state that it is deviating from this practice and provide a rational explanation for doing so.

If Commerce again decides to use the "others" provision of coal in the Indian Import Statistics, it must (1) provide record evidence that this provision at least roughly corresponds to the type of coal used to dry steel fence posts; (2) determine whether the type of coal used by Hebei or a reasonably comparable type is reflected in the TERI domestic data, and (3) provide a reasonable explanation as to why the "others" import data more accurately reflects the costs incurred in producing the subject merchandise. In any event, Commerce may not support the use of import data in the surrogate coal value on the basis of tax-exclusivity if there is no record evidence to indicate that the Indian coal market prices are distorted by taxes and/or duties. Further, the other reasons thus far offered for Commerce's choice of import coal data have been found insufficient and will not sustain the choice.

366 F. Supp. 2d at 1276–77.

Twenty days after Hebei Metals II was issued, Commerce sent a supplemental questionnaire to Hebei, asking it to provide (1) "complete and detailed information regarding the type and grade of coal used by Hebei during the POI [period of investigation] to dry steel fence posts;" (2) "an industry expert chemical analysis demonstrating the useful heat value (UHV) of the type and grade of coal used by Hebei during the POI;" and (3) "worksheets that illustrate how the costs reported for coal consumption during the POI on the audited financial statements reconcile to the general ledger and trial balance, materials sub-ledgers, production records, and inventory records." Letter from Commerce to Grunfeld, Desiderio (Mar. 30, 2005), P.R. Doc. 43, Def.'s App., Tab 1, at 1–2 [hereinafter First Supplemental Questionnaire]. Commerce also invited Hebei to submit additional information regarding (4) "evidence of the type or types of coal normally used for drying steel fence posts in the PRC or India; (5) "non-aberrational price data that

best relates to the type or types of coal used by Hebei during the POI;" or (6) "information that is contemporaneous with the POI." Id., Def.'s App., Tab 1, at 2.

Hebei responded on April 8, 2005. See Letter from Grunfeld, Desiderio to Commerce (April 8, 2005), P.R. Doc. 43, Def.'s App., Tab 2 [hereinafter First Supplemental Response]. In answering Commerce's inquiries regarding the type of coal it used, Hebei responded that all its reported coal consumption was consumed by a subcontractor [hereinafter "Subcontractor Y"] to "one of the companies [hereinafter "Company X"] that produced the subject merchandise for Hebei." Id., Def.'s App., Tab 2, at 1. Hebei explained that Company X

> no longer uses [Subcontractor Y] as a subcontractor and has been unable to obtain any
> information from [Subcontractor Y] detailing the specific grade and type of coal it used
> three years ago for drying fence posts. Hebei and [Company X] never kept such records
> in their ordinary course of business.

Id., Def.'s App., Tab 2, at 1. Hebei also stated that it was unable to provide an industry expert chemical analysis of the coal used by Subcontractor Y "because there is no existing sample of this coal. In its ordinary course of business, Hebei does not keep samples of coal or records regarding coal used by its subcontractors." Id., Def.'s App., Tab 2, at 1.

Hebei followed its First Supplemental Response by submitting domestic Indian coal prices for 2001-2002 published by the Tata Energy Research Institute's Energy Data Directory & Yearbook (the "2001-2002 TERI data"), which updated the 2000-2001 TERI data already on the record. Letter from Grunfeld, Desiderio to Commerce (April 15, 2005), P.R. Doc. 43, Def.'s App., Tab 3 [hereinafter Second Supplemental Response]. In this submission, Hebei stated that

> in light of the Court's recognition that the record does not contain precise information

regarding the grade of coal used by Hebei during the POI, it is more accurate to calculate a surrogate value for coal using the average prices for all grades and types of coal contained in this TERI data.

Id., Def.'s App., Tab 3, at 2.

On April 22, 2005, the Government moved for a 60-day extension of time in which to file the remand results because "Hebei did not provide the information Commerce requested of it." Def.'s Mot. for Time (Apr. 22, 2005). The motion was granted, allowing Commerce to file the remand results on or before July 8, 2005. Order (May 16, 2005).

In the meantime, Commerce asked Hebei for more information. Commerce asked Hebei to explain in detail the steps it took to contact its subcontractors in order to obtain information about the coal used and to provide all available correspondence between these parties. Letter from Commerce to Grunfeld, Desiderio (Apr. 26, 2005), P.R. Doc. 43, Def.'s App., Tab 4, at 1–2 [hereinafter Second Supplemental Questionnaire]. Hebei responded merely that it contacted Company X and Subcontractor Y "by telephone and asked for the requested information. There is no written correspondence related to this information request." Letter from Grunfeld, Desiderio to Commerce (May 2, 2005) P.R. Doc. 43, Def.'s App. Tab 5, at 1 [hereinafter Third Supplemental Response].

In response to Commerce's inquiry as to why it was not necessary for Hebei or its subcontractor to know the coal quality specifications, Hebei stated that

the coal consumption reported by Hebei in the investigation was used by [Subcontractor Y], an unaffiliated subcontractor whose task was to apply a coating to the fence posts. The coal was merely used for heat to help dry this coating. Hebei or [Company X] were only concerned that the fence posts they received from [Subcontractor Y] had been properly coated. They had no concern with the method [Subcontractor Y] used to accomplish this task. It is both unreasonable and irrational to assume that Hebie [sic]

would take an interest in the grade, type or UHV value of the coal used by its subcontractor in its drying room.

Presumably, [Subcontractor Y] used the least expensive coal available since drying a coating on fence posts does not require the generation of an excessive amount of heat or energy.

Third Supp. Response, Def.'s App., Tab 5, at 1–2. For the same reason, Hebei also explained that neither it nor Company X had any records pertaining to coal grade or type. Id., Def.'s App., Tab 5, at 2.

Responding to a question about the identity of the subcontractor that Company X "currently use[s] to provide coal in the production of fence posts," Hebei stated that Company X

never used a subcontractor to "provide" coal. [Subcontractor Y's] job was to apply a coating to the fence posts, and it was [Subcontractor Y's] own choice to assist the drying of this coating by using coal heat. Other subcontractors accomplished this task using electricity, which is why [Subcontractor Y] was the only subcontractor to report coal consumption.

Id., Def.'s App., Tab 5, at 2.

When asked to about the standard type or types of coal used in the Indian or PRC markets, Hebei repeated its position that coal was merely used in the drying process and added that "there is no industry standard for the type or grade of coal that should be used to dry a coating on fence posts." Id., Def.'s App., Tab 5, at 3.

Finally, Commerce asked Hebei to explain its position that the domestic TERI data provide a better surrogate value than the import statistics used previously. Hebei responded that the TERI data conformed to the preference for domestic data and referenced information it was submitting from Canadian and American web sites to show that the drying of coatings is a low-heat operation requiring only cheaper coal rather than more expensive imported coal. Id., Def.'s App., Tab 5, at 4.

Commerce obtained a partial extension of time on July 7, 2005, which allowed filing of the remand results on or before July 21, 2005. See Order (July 7, 2005). While its motion for an extension of time was pending and before Hebei had filed its opposition to that motion, Commerce sent Hebei a fourth and final questionnaire, seeking additional information about the 2001-2002 TERI data. Letter from Commerce to Grundfeld, Desiderio (June 27, 2005), P.R. Doc. 43, Def.'s App., Tab 6. Hebei replied to Commerce's TERI questions on July 5, 2005. Letter from Grunfeld, Desiderio to Commerce (July 5, 2005), P.R. Doc. 43, Def.'s App., Tab 7 [hereinafter Fourth Supplemental Response].

Commerce issued a preliminary remand determination on July 14, 2005, in which it used the 2001-2002 TERI domestic data but applied AFA. Hebei filed comments in opposition to the proposed application of AFA.

Commerce maintained its use of AFA in the final remand results, which were filed with the court on July 21, 2005. In the Second Remand Determination, Commerce found that the 2001-2002 TERI data is exclusive of taxes and duties and is the best data source for a surrogate coal value. See Second Remand Determ. at 2 (citing Tata Energy Research Institute's Energy Data Directory & Yearbook for 2001/2002 [hereinafter TERI Data]). Commerce applied AFA on the basis of what it found to be Hebei's "insufficient and/or confusing submissions" and in order to "ensure that Hebei 'would not benefit from its lack of cooperation.'" Second Remand Determ. at 18. In this vein, Commerce believed

> [i]t would not be appropriate for the Department to reward Hebei by using the surrogate value suggested by Hebei, the TERI steam coal averages of grades A, B, C and D, when it provided no information on the record to demonstrate the appropriateness of this recommended surrogate value. Thus, in applying AFA, the Department finds it most appropriate to use the simple average of the highest coal grade, coal grade A, in the 2001/2002 TERI Data as the surrogate value for coal.

Id. at 18–19.  The revised surrogate coal valuation resulted in a slightly decreased weighted-average

antidumping duty margin, which fell to 6.49 percent from the 6.52 percent margin calculated in the First

Remand Determination.[2]  Second Remand Determ. at 22.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this case pursuant to 28 U.S.C. § 1581(c) (2000) and 19 U.S.C.

§ 1516a(a)(2)(B)(i) (2000).  Commerce's antidumping duty calculation shall be sustained if it is supported

by substantial evidence and is otherwise in accordance with law.  See 19 U.S.C. § 1516a(b)(1)(B).

## DISCUSSION

I.       COMMERCE PROPERLY APPLIED ADVERSE FACTS AVAILABLE IN SELECTING A SURROGATE
         COAL VALUE

When Commerce receives insufficient information from an interested party to make a determination,

19 U.S.C. § 1677e(a) authorizes Commerce to fill in the factual gaps with "facts otherwise available."  If

Commerce goes a step further and finds that the interested party "has failed to cooperate by not acting to

the best of its ability to comply with a request for information," 19 U.S.C. § 1677e(b) provides that

Commerce "may use an inference that is adverse to the interests of that party in selecting from the facts

otherwise available."  The statute does not define "the best of its ability" expressly, but the Federal Circuit

has elaborated on what the statute requires of Commerce:

> Before making an adverse inference, Commerce must examine respondent's actions and
> assess the extent of respondent's abilities, efforts, and cooperation in responding to
> Commerce's requests for information.

---

[2]  The initial weighted-average antidumping duty margin calculated in the Final Determination
was 6.60 percent.

. . . .

To conclude that an importer has not cooperated to the best of its ability and to draw an adverse inference under section 1677e(b), Commerce need only make two showings. First, it must make an objective showing that a reasonable and responsible importer would have known that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations. Second, Commerce must then make a subjective showing that the respondent under investigation not only has failed to promptly produce the requested information, but further that the failure to fully respond is the result of the respondent's lack of cooperation in either: (a) failing to keep and maintain all required records, or (b) failing to put forth its maximum efforts to investigate and obtain the requested information from its records. An adverse inference may not be drawn merely from a failure to respond, but only under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made; i.e., under circumstances in which it is reasonable to conclude that less than full cooperation has been shown. While intentional conduct, such as deliberate concealment or inaccurate reporting, surely evinces a failure to cooperate, the statute does not contain an intent element. "Inadequate inquiries" may suffice. The statutory trigger for Commerce's consideration of an adverse inference is simply a failure to cooperate to the best of respondent's ability, regardless of motivation or intent.

Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382–83 (Fed. Cir. 2003) (citation omitted).

With regard to the first, objective showing, Commerce found that "a reasonable respondent would have made some effort to document the type of coal utilized in its production of fence posts." Second Remand Determ. at 20–21. Commerce supported this finding by noting that coal is among the factors of production used to produce the subject merchandise, and therefore is something about which Hebei may be expected to keep accurate records. Id. at 20. As Commerce observes, id., this court has stated that a "reasonable and responsible producer . . . will have accurate records of its factors of production." Tianjin Mach. Imp. & Exp. Corp. v. United States, 353 F. Supp. 2d 1294, 1299 (Ct. Int'l Trade 2004) (quoting Shandong Huarong Gen. Group Corp. v. United States, Slip Op. 03-135 at 36 (Ct. Int'l Trade Oct. 22,

2003)).  The court agrees with Commerce.

Turning to the subjective showing, Commerce concluded that "Hebei failed to cooperate by not acting to the best of its ability to comply with the Department's requests for information regarding the type of coal used in its production of subject merchandise."  Second Remand Determ. at 17.  Commerce found Hebei was unresponsive to "questions concerning the type of coal used in fence post production," and cited the following as indications of Hebei's unresponsiveness:

> Hebei claimed that it telephoned its subcontractor to gather this information, but provided no documentation to support its claim.  Hebei provided information from web-sites describing fence post production in Canada and the United States, but that information is not probative of fence post production in the PRC or India that uses coal as a heat source for drying.  Hebei speculates that a fence post producer using coal would purchase the cheapest coal possible, arguing that fence post production requires a low UHV, but has provided no supporting documentation to support this presumption.  The Department notes that it is also possible to presume that producer would purchase high-quality, high UHV coal, allowing the producer to use less coal over a longer period than it would with the cheap, low UHV coal.  In addition, Hebei brought this litigation against the Department and claimed that the TERI Data coal prices on the record of this proceeding were more representative of the production experience of the PRC producer than the import prices the Department had used in the Final Determination.  It is not unreasonable to expect that having made this claim, Hebei should be able to answer the Department's requests with regard to the grade and/or type of coal used to produce fence posts by the respondent, by a Chinese producer, or by an Indian producer.

Id. at 17–18.

Hebei argues that Commerce "fails to cite any specific instance where Hebei did not act to the best of its ability," Hebei Comments on Second Remand at 7, but Hebei does not address the fact that it did not document or detail its claimed attempts to obtain the requested information from Company X and Subcontractor Y by telephone.

Despite litigating this issue vigorously, Hebei now asserts that

> Commerce is seeking very minor data from an unaffiliated subcontractor three years after the fact. As explained repeatedly to Commerce, neither Hebei nor its supplier would have a reason to keep records about the type of coal an unaffiliated subcontractor was using to dry fence posts because this information was not relevant to their business operations.

Hebei Comments on Second Remand at 9. During the investigation and earlier in this litigation, Hebei was not so dismissive of the choice of a surrogate coal value. During the investigation, Hebei asserted that "steam coal" should be valued on the basis of prices "for non-coking steam coal." Hebei Investigation First Surrogate Data Submission at 6. In moving for judgment on the agency record, Hebei advocated the use of steam coal values listed in the 2000/2001 TERI data and asked the court to remand "with instructions for Commerce to adopt a surrogate value for coal using the domestic Indian prices on record." Hebei Mot. for J. on Agency R. at 10. After the First Remand Determination, Hebei asserted that "[t]he record plainly shows that Hebei does not import its coal." Hebei Comments on First Remand at 5. In sum, Hebei has repeatedly indicated that, to some extent, it knew the type of coal it did or did not use, as the Government argues in its brief. See Def.'s Response to Hebei Comments on Second Remand at 5. If, as Hebei now asserts, it had no reason to know "whether the subcontractor was using electricity or coal to dry the coating or what type of coal might have been used," Hebei Comments on Second Remand at 9, one wonders how Hebei could have known that its subcontractor used domestically-sourced coal of a type that would have made it appropriate to use Indian domestic non-coking steam coal prices in computing a surrogate value.

The inconsistencies in Hebei's litigation positions provide a reminder why the Federal Circuit and this court have recognized that a reasonable and responsible producer will keep accurate records of factors of production. See Nippon Steel, 337 F.3d at 1382 ("While the standard does not require perfection and

recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping."); Tianjin Mach. Imp. & Exp. Corp., 353 F. Supp. 2d at 1299; Shandong Huarong, Slip Op. 03-135 at 36. In Shandong Huarong, this court emphasized that a producer who requests a review does so under the expectation that it has acted as a reasonable and responsible producer in keeping records of its factors of production: "There can also be no doubt that a reasonable and responsible producer, seeking an administrative review, will have accurate records of its factors of production." Id., Slip Op. 03-135 at 36.

Similarly, Hebei chose to challenge Commerce's choice of a surrogate coal value and thereby subjected itself to the expectation that it have records of this factor of production. Until this second remand proceeding, Hebei had not stated that the coal not was a significant factor of production used to make the subject fence posts, and it had not admitted that it has no idea of what kind of coal was used to produce its fence posts.

Hebei attempts to avoid the application of adverse facts available on the basis that the information requested was outside of its control. See Hebei Comments on Second Remand at 9–10. Hebei cites Usinor Sacilor v. United States, 18 CIT 1155, 1162, 872 F. Supp. 1000, 1006–07 (1994), and World Finer Foods, Inc. v. United States, 24 CIT 541, 543–46 (2000), for what Hebei characterizes as the "well established" proposition that adverse facts cannot be applied where a producer is unable to obtain information outside its control. Hebei Comments on Second Remand at 9–10. These case, however, do not recognize such a broad safe harbor from the imposition of adverse facts.

First of all, the relevance of Usinor Sacilor is limited by the fact that it reviewed Commerce's

application of the now-repealed best information available ("BIA") provisions of 19 U.S.C. § 1677e(c) (1988, repealed 1994). See 18 CIT at 1161, 872 F. Supp. at 1006. The case is distinguishable on other grounds as well. The respondent in that case had reached an agreement with Commerce to provide limited reporting of downstream sales. Id., 18 CIT at 1159, 872 F. Supp. at 1005. Although the respondent was unable "to trace the source of the steel processed by its secondary steel centers," it "substantially met the requirements of the original and modified questionnaire requests. [Respondent] supplied more data than was required under the limited reporting agreement and provided well over 99% of the data demanded by the original questionnaire." Id., 18 CIT at 1162, 872 F. Supp. at 1006. The court observed that "the deficiencies in [respondent's] data were a result of factors outside [respondent's] control," but it was the circumstances of the case bearing on reasonable conduct—rather than a simple finding that the respondent did not keep certain records—that made application of severely adverse BIA improper: "[Respondent's] subsidiaries did not maintain the sourcing data. Therefore, any tracing would have been done manually. Due to the time limitations and the large number of invoices involved (180,000), this would have been unreasonable." Id., 18 CIT at 1162, 872 F. Supp. at 1007 (citation omitted).

In contrast, Hebei was not confronted with such an extreme logistical challenge. Indeed, Hebei asserts that only one subcontractor was involved in using coal to dry the fence posts during the period of investigation. Moreover, unlike the respondent in Usinor Sacilor who initially informed Commerce that outside factors prevented it from reporting accurate information on downstream sales, id., 18 CIT at 1159, 872 F. Supp. at 1005, Hebei remained silent about potential limitations on its ability to provide data on coal—one of its factors of production—until the second remand proceedings. Prior to this point, Hebei

argued repeatedly for a domestic Indian steam coal surrogate value, giving the impression that it had some basis for that position beyond a bare distinction between domestic and import data. See Pls.' Mot. for J. on Agency R., at 10; Hebei Comments on First Remand Determ. at 5.

World Finer Foods also fails to support Hebei's position. In that case, an Italian respondent had left the U.S. market and was in a dire financial condition that severely limited its ability to respond to Commerce's questionnaire during an administrative review. 24 CIT at 542. Nevertheless, the Italian respondent offered to supply any limited information Commerce might find helpful. Id. at 544. Commerce did not respond to the Italian respondent's offer and applied adverse facts available to it. By failing to offer any guidance to the Italian respondent, Commerce failed its duty under 19 U.S.C. § 1677m(c)(2) to consider the respondent's "ability to respond with some specificity and to modify its requirements, if necessary." 24 CIT at 544. Commerce's failure to attempt to cooperate with the Italian respondent—which had little incentive to cooperate as a result of its absence from the market—left the American importer "to bear the full impact of increased duties." Id. at 545. Presented with an offer to cooperate to the best of the Italian respondent's diminished abilities, it was Commerce's failure to discharge its burden under 19 U.S.C. § 1677m(c)(2) that made imposition of adverse facts improper. See id. at 544 (discussing Commerce's decision not to apply first-tier BIA in a similar situation in Certain Fresh Cut Flowers from Colombia, 59 Fed. Reg. 15,159, 15,174 (Dep't Commerce Mar. 31, 1994) (final results)). World Finer Foods, then, does not support Hebei's position that adverse facts available are inappropriate merely because it has not kept records regarding a factor of production used by a subcontractor.

Here, in contrast, Commerce fulfilled its duty under 19 U.S.C. § 1677m(d), when it provided

Hebei with an opportunity to remedy deficiencies in its First Supplemental Response. See Second Supp. Quest., Def.'s App., Tab 4. Among its many questions seeking some indication of the coal used by Hebei or in India and the PRC in general, Commerce asked Hebei to explain in detail the steps it took to contact its subcontractors in order to obtain information about the coal used and to provide all available correspondence between these parties. Hebei responded merely that it contacted its subcontractors "by telephone and asked for the requested information. There is no written correspondence related to this information request." Third Supp. Response, Def.'s App., Tab 5, at 1. In response to Commerce's inquiry as to why it was not necessary for Hebei or its subcontractor to know the coal quality specifications, Hebei stated that "[i]t is both unreasonable and irrational to assume that Hebie [sic] would take an interest in the grade, type or UHV value of the coal used by its subcontractor in its drying room." Id., Def.'s App. Tab 5, at 1. These responses do not constitute the "maximum effort" required by Commerce's requests for information. Cf. Shandong Huarong, Slip Op. 03-135 at 36. Having continuously pursued this issue, Hebei should have been ready to support its claims with solid evidence. Moreover, at this point it is not clear that Commerce's choice is truly adverse. At most, it is a choice of limited partial adverse available facts, and no party to the litigation is in a position to say it is not the most accurate information.

## II.     RULE 11 SANCTIONS ARE NOT WARRANTED

Hebei argues it has been subjected to harassment and unnecessary delay "in violation of Rule 11(b)(1) and (2)." Hebei Comments to Remand Determination at 11 (citing Fed. R. Civ. P. 11(b)(1), (2)). Hebei bases its harassment allegation on Commerce's use of AFA, which it considers to be meritless and completely ignorant of the record and existing law. As discussed above, however, Commerce's use

of AFA not only has some merit, it is proper under the statute as interpreted by the courts.

With regard to its allegation of unnecessary delay, Hebei argues that Commerce dragged out the remand proceedings for almost four months even though Hebei provided the surrogate data it eventually used—the 2001-2002 TERI data—on April 15, 2005. The court disagrees. Instead of needlessly prolonging the remand proceedings, Commerce was dutifully following the court's instructions by attempting to find information that would support a surrogate coal value, just as it was fulfilling its statutory duty to allow Hebei the opportunity to remedy a deficient submission. See 19 U.S.C. § 1677m.

**CONCLUSION**

Substantial evidence supports Commerce's selection of Indian domestic data for the surrogate coal value and its application of adverse facts available therein.  Accordingly, the Commerce's Second Remand Determination is sustained.  Hebei's request for Rule 11 sanctions against Government counsel and/or Commerce is denied.


                                               /s/Jane A. Restani
                                             Jane A. Restani
                                             Chief Judge


Dated:  This 22nd day of September, 2005.
          New York, New York