**Slip Op. 05-32**

# UNITED STATES COURT OF INTERNATIONAL TRADE

HEBEI METALS & MINERALS IMPORT &
EXPORT CORPORATION AND HEBEI
WUXIN METALS & MINERALS TRADING
CO., LTD.,

        Plaintiff,

        v.

UNITED STATES,

        Defendant.

Court No. 03-00442

[Antidumping duty redetermination remanded for reconsideration of surrogate coal values.]

Dated: March 10, 2005

Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, (Bruce M. Mitchell, Mark E. Pardo, and Paul Figueroa) for plaintiff.

Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (David S. Silverbrand), Ada Bosque, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

# OPINION

**RESTANI, Chief Judge:**

In Hebei Metals & Minerals Imp. & Exp. Corp. v. United States, No. 03-00442, Slip Op. 04-88 (Ct. Int'l Trade July 19, 2004) [hereinafter Hebei Metals I], the court remanded to the United States Department of Commerce two issues pertaining to its calculation of the antidumping duty margin for lawn and garden steel fence posts from the People's Republic of

China ("PRC"), a country designated by Commerce as having non-market economy ("NME").[1] Each issue involved the use of surrogate data from India because 19 U.S.C. § 1677b(c)(1)(B) (2000) requires that an antidumping duty on a product from a NME country be calculated using surrogate values from an appropriate market economy country or countries.

First, with regard to Commerce's use of Indian import data for surrogate coal value, Hebei Metals I instructed Commerce either to "provide further explanation based on record evidence" that the Indian import data was more accurate than the available Indian domestic data or to "conduct further investigations to determine whether Indian import or domestic data provides a value that more accurately reflects the coal consumption patterns of producers in the relevant industry." Hebei Metals I, Slip Op. 04-88 at 16–17. Second, with regard to the removal of internal consumption from the denominators but not the numerators of the surrogate financial ratios, the court issued a series of instructions that essentially required Commerce to explain its decision on the basis of record evidence or to adopt an alternative method for surrogate ratio calculations based on record evidence. Id. at 35–36.

Now before the court is Commerce's remand determination, Final Results of Redetermination Pursuant to Remand, Hebei Metals & Minerals Imp. & Exp. Corp. and Hebei

---

[1] The court assumes familiarity with Hebei Metals I, which reviewed the margin calculations made in Final Determination of Sales at Less Than Fair Value: Lawn and Garden Fence Posts from the People's Republic of China, 68 Fed. Reg. 20,373 (Dep't Commerce April 25, 2003) [hereinafter Final Determination], and explained in Decision Memorandum for the Final Determination of the Antidumping Duty Investigation of Lawn and Garden Steel Fence Posts from the People's Republic of China (Dep't Commerce April 18, 2003), P.R. 158, Pls.' App., Ex. 2 [hereinafter Decision Memorandum].

Wuxin Metals & Minerals Trading Co., Ltd. v. United States (Dep't Commerce Oct. 20, 2004)

[hereinafter Remand Determination].  In the Remand Determination, Commerce discussed these

two issues at greater length and redetermined that the surrogate coal value and the surrogate

financial ratios had been calculated properly in the Final Determination.[2]  The explanations as to

the calculation of the surrogate financial ratios are adequate.  The Remand Determination,

however, falls short of the requirements imposed on Commerce by statute as interpreted by the

federal courts and articulated in Hebei Metals I with respect to the surrogate coal value.

Accordingly, the court must remand again.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this case pursuant to 28 U.S.C. § 1581(c) (2000) and 19

U.S.C. § 1516a(a)(2)(B)(i).  Commerce's antidumping duty calculation shall be sustained if it is

supported by substantial evidence and is otherwise in accordance with law.  See 19 U.S.C. §

1516a(b)(1)(B).

## BACKGROUND

I.       COMMERCE'S USE OF INDIAN IMPORT DATA FOR THE SURROGATE COAL VALUE

A.       **Commerce's Investigation and Determination**

Coal is used in the production of the subject fence posts to generate heat that aids in the

---

[2]  The Remand Determination also discusses the surrogate steel pallets calculation that
was addressed in Hebei Metals I.  See Remand Determ. at 5–7, 15–18.  Commerce complied
with the court's instructions regarding the surrogate steel pallets calculation, see id. at 15, and the
issue is not now before the court.  If Commerce disagreed with the court and had valid reasons
for not fully addressing this issue in its original brief, it should have asked for reconsideration,
but it may not add new information or argument on remand as to an issue that was not remanded
for reconsideration or re-explanation.

drying of coating materials.  Decision Mem., at cmt. 4, Pls.' App., Ex. 2, at 11.  Commerce's

questionnaire asked Plaintiffs Hebei Metals & Minerals Import & Export Corporation and Hebei

Wuxin Metals & Minerals Trading Co., Ltd. (referred to collectively hereinafter as "Hebei") to

"[r]eport the energy used to produce one unit of the subject merchandise.  If you used a fuel to

generate electricity, please report the fuel actually used."  Letter from Commerce to Grunfeld,

Desiderio (July 15, 2002), attachment at sec. D, sixth page, P.R. Doc. 16 [hereinafter

Questionnaire].  Hebei responded as follows:

> The . . . factory has reported the consumption of coal consumed, including
> the coal used by its subcontractor, in metric tons required to produce one
> metric ton of Fence Posts . . . . Coal usage was determined by allocating
> the coal consumed from the monthly workshop record for coal
> consumption to the products produced in the factory based on their
> respective weight.

Letter from Grunfeld, Desiderio (Sept. 11, 2002), at Part B, p. 15, P.R. Doc. 88 [hereinafter

Questionnaire Response].  Shortly thereafter, Hebei submitted publicly available surrogate coal

data but did not state that it used a particular category and grade of coal.  In the main text of the

Hebei First Surrogate Data Submission, the brief discussion of coal refers initially to "steam

coal" and then to "non-coking steam coal:"

> Steam Coal should be valued using data from the Teri Energy Data
> Directory & Yearbook for 2000/2001.  The value is derived from price for
> non-coking steam coal as of April 20, 2000.  These steam coal prices are
> based on grades for non-coking coal that are determined by coals UHV
> ("Useful Heat Value").  The UHV is measured by a range of kcal/kg.  The
> average values for non-coking steam coal are as follows:
>
> | GRADE A (UHV over 6200 kcal/kg.) | 1109.26 RS/MT |
> |---|---|
> | GRADE B (UHV 5600–6200 kcal/kg.) | 1017.89 RS/MT |
> | GRADE C (UHV 4940–5600 kcal/kg.) | 870.42 RS/MT |

GRADE D (UHV 4200–4940 kcal/kg.)          742.95 RS/MT

Source documents for these surrogate values have been provided in Exhibit 9. Letter from Grunfeld, Desiderio (Sep. 18, 2002), at 6, P.R. Doc. 67, Def.'s App., Tab 7 [hereinafter Hebei First Surrogate Data Submission].  Exhibit 9 to the Hebei First Surrogate Data Submission provides pages from the Tata Energy Research Institute's Energy Data Directory & Yearbook for 2000/2001, P.R. Doc. 67, Ex. 9, at 44, Def.'s App., Tab 7 [hereinafter "TERI data"].  The TERI domestic statistics submitted by Hebei provide prices for seven grades and three categories of non-coking coal in all Indian states other than Assam, Arunachal Pradesh, Meghalaya, and Nagaland.  Id.

In its preliminary determination, Commerce stated only that it valued coal using import prices for an "others" basket of coal corresponding to article code "27011909" as published in the 2001-2002 Monthly Statistics of Foreign Trade of India Volume II: Imports [hereinafter "Indian Import Statistics"].  See Memorandum Regarding Factors of Production Valuation for the Preliminary Results (Dep't Commerce Nov. 27, 2002), at 5–6 and Ex. Y, at 113–15, P.R. Doc. 104, Def.'s App., Tab 12 [hereinafter Preliminary FOP Mem.];  Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Lawn and Garden Steel Fence Posts from the People's Republic of China, 67 Fed. Reg. 72,141, 72,145 (Dep't Commerce Dec. 4, 2002) [hereinafter Preliminary Determination], amended by Correction: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Lawn and Garden Steel Fence Posts from the People's Republic of China, 68 Fed. Reg. 8,737 (Dep't Commerce Feb. 25, 2003) (correcting the scope of the investigation to

correspond with the International Trade Commission's preliminary determination). In the subsequent comment period, Hebei challenged Commerce's use of the Indian import price for imported coal. See Br. from Grunfeld, Desiderio to Commerce (Mar. 13, 2003), at 9–11, P.R. Doc. 147.

In the Final Determination, Commerce continued to use the "others" data from the Indian Import Statistics. Decision Mem., at cmt. 4, Pls.' App., Ex. 2. Commerce rejected Hebei's contention that coal should be valued using Indian domestic prices for four grades of "steam coal" as listed among the many prices contained in the TERI data. Commerce supported its choice on the grounds that the Indian Import Statistics data was contemporaneous and "free of taxes and duties," id., while, in comparison, Hebei failed to supply evidence showing that "steam coal, which is suitable for use in boiler generating steam and most often used for electricity generation, was used in the production process;" and failed to "demonstrate the 'useful heat value' (UHV) of the coal used in the production." Id.

## B.      Hebei Metals I

Hebei Metals I, recognizing the normal practice and conditional presumption in favor of domestic prices, concluded that "Commerce used the Indian import price for the surrogate coal value, but failed to provide substantial evidence demonstrating why imported coal yielded a more accurate surrogate value than domestic coal." Slip Op. 04-88 at 2. Commerce did not explain why an Indian manufacturer would pay for imported coal. The court reached its conclusion in Hebei Metals I despite the deficiencies in the alternative value offered by Hebei. The court instructed that, on remand, "Commerce must either provide further explanation based on record

evidence or conduct further investigations to determine whether Indian import or domestic data provides a value that more accurately reflects the coal consumption patterns of producers in the relevant industry." Slip Op. 04-88 at 16–17.

### C.     The Remand Determination

In the Remand Determination, Commerce again used the "others" coal provision from the Indian Import Statistics. Commerce supported its position on the grounds that: (1) Commerce found the value submitted by Hebei to be "more distorted and less accurate than the coal value in the Indian import statistics which the Department used in the original investigation," Remand Determ. at 10; and (2) the use of import data assures that taxes and duties will not be included in the surrogate calculations. Id. at 13.

Commerce identified four types of "distortions" in the domestic data submitted by Hebei. First, the Remand Determination, citing Hebei Metals I, reiterated its position from the Final Determination that Hebei failed to provide record evidence to explain why domestic coal prices should be drawn from TERI data for the category "steam coal and rubble," grades A through D, but not steam coal grades E through G or other categories of coal. According to Commerce, this failure rendered the proposed value "unclear and arbitrarily limited in scope." Remand Determ. at 11.

Second, in comparing the Indian import statistics to the TERI data selected by Hebei, Commerce determined that the import category was broader and therefore "more appropriate for use." Id. at 11–12.

Third, in comparing the Indian import statistics to all the prices listed in the TERI

domestic data (i.e., both the prices Hebei used to construct its proposed surrogate value and other prices), Commerce found that the highest price in the TERI data was over 560 percent greater than the lowest TERI price, while the highest Indian import statistics price was only 274 percent greater than the lowest Indian import statistics price. This led Commerce to find that "[o]verall, . . . the TERI data had a greater variance of coal prices with a greater proportion of aberrational and inconsistent gaps in data." Id. at 12. No further explanation was given as to the nature of the "aberrational and inconsistent gaps in the data." Id.

Fourth, Commerce claimed that the selection of the import data accords with its preference "to use data which comes from the same source, where possible, for all factors of production." Id. at 29.

In addition to the distortions it identified, Commerce rejected Hebei's domestic data in part because it might contain taxes or duties. In the absence of "record evidence or any clarifying information about the TERI data" pertaining to whether the TERI data included Indian excise and sales taxes, Commerce "determined that the domestic coal prices may not be free of taxes and duties." Id. at 13. Because Commerce's policy is to use surrogate value prices that are tax–exclusive, Commerce chose the import data. Id. ("The Department chose to use the Indian import statistics knowing that the values were free of taxes and duties.").

Taken together, these considerations led Commerce to find "substantial record evidence indicating that the domestic coal values in the TERI data are distorted, arbitrary, and unreliable."

Id. at 14.  Commerce found that, in comparison, the import values "approximate the cost incurred by Indian fence-post producers better than the domestic coal values in the TERI data."  Id.

## II.    COMMERCE'S CALCULATION OF SURROGATE FINANCIAL RATIOS

In the Final Determination, Commerce calculated surrogate ratios for selling, general and administrative expenses ("SG&A"), and factory overhead using the 2001 Annual Report of Surya Roshni Ltd., an Indian manufacturer of lighting products and steel tube.  See Decision Mem., at cmt. 8, Def.'s App., Ex. 2.  In the denominators of the ratios, Commerce deducted the amount listed for internal raw material consumption on Surya's profit and loss statement.  Id.  Commerce did not, however, address the possibility that removal of internal raw material consumption from the denominators warrants removal of internally-related SG&A and overhead expenses from the numerators.

Hebei Metals I concluded that Commerce's explanation of its surrogate ratio calculations was inadequate both in terms of (1) its determination that the "internal consumption" values on Surya's financial statements should be removed from the denominators of the surrogate ratios, and (2) its failure to explain why internally-related SG&A and overhead expenses should not be removed from the ratios' numerators.  Slip Op. 04-88 at 33–35.  Accordingly, the court remanded the issue to Commerce for further explanation and, if necessary, further investigation along with these instructions:

> If Commerce is able to explain adequately the rationale for removing
> internal raw material consumption from the denominator of the surrogate
> ratios, then Commerce shall: (1) determine to what extent, if any, SG&A
> and factory overhead expenses are attributable to internal raw material
> consumption; and (2) remove appropriate amounts from the numerators of

the SG&A and factory overhead surrogate ratios.  If Commerce is unable
to obtain sufficient evidence for this task, Commerce shall: (a) include
internal raw material consumption in the denominator of the SG&A,
factory overhead, and profit surrogate ratios; or (b) provide a rational
explanation why more accurate surrogate ratios result from the removal of
internal raw material consumption from the ratios' denominators only.

Id. at 35–36.

In terms of the removal of "internal consumption" from the denominators of the surrogate

ratios, the Remand Determination provided the following responses to the issues raised in Hebei

Metals I:  (1) "internal consumption" in Surya's financial statements "reflects the transfers of

components from one facility to another facility," Remand Determ. at 21; (2) "double counting"

occurs in the recognition of sales "when inter-facility transfers are recognized as sales by the

transferring facilities, the total sales revenue for the consolidated corporate entity are inflated

artificially," id. at 22; (3) double counting occurs similarly in the recognition of manufacturing

costs, such that "both sides of the income statement are adjusted equally," id. at 22–23; and (3)

removal of internal consumption from the denominator of the ratios is appropriate "because

Surya has not incurred this amount in its sales to outside parties."  Id. at 24; see also id. at 25

("Surya neither incurred this expenditure nor earned this income.").

In redetermining that removal of any internally–related general costs from the ratios'

numerators was inappropriate, Commerce made the following findings:  (1) "based upon its

study of the Surya's financial statements and the company's history, the evidence indicates that

there are no SG&A or factory overhead expenses attributable to internal raw material raw [sic]

consumption," and (2) "a reduction to the numerators of the SG&A and factory overhead

surrogate ratios is not warranted because our purpose here is to derive a ratio that allocates the entire amount of SG&A and factory overhead expense to the products produced and sold by the company to outside parties." Remand Determ. at 25–26.

## DISCUSSION

**I.  COMMERCE'S USE OF INDIAN IMPORT DATA FOR THE SURROGATE COAL VALUE IS ARBITRARY AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE**

Hebei Metals I remanded the surrogate coal value issue for two reasons. First, Commerce failed generally to provide a reasonable basis for selecting the "others" data from the Indian Import Statistics, even though Hebei's proposed surrogate value was similarly flawed. Second, Commerce lacked substantial evidence for its position that, because the import data was free of taxes and duties, it represented a more accurate value than the domestic data on the record. Slip Op. 04-88 at 14–17. The Remand Determination does not address these failings adequately. Commerce, without an evidentiary basis, continues to make an arbitrary distinction between the import data—the breadth of which it presumed to encompass the coal used by Hebei—and the narrower value proposed by Hebei, which was derived from the TERI domestic data.[3] In the

---

[3] In discussing its continued use of the Indian Import Statistics "others" provision for the surrogate coal value, the Remand Determination focuses on establishing that the "others" provision provides a more reliable surrogate value than the prices Hebei extracted from the domestic TERI data. This was unnecessary; Hebei Metals I established that "[w]ithout additional evidence, it is a matter of speculation whether [the steam coal cited by Hebei] is used in the production of the subject fence posts." Slip Op. 04-88 at 14. Commerce's task on remand was not to reiterate that Hebei's proposed surrogate value was unsupported by the record; it was for Commerce to demonstrate affirmatively that use of either the "others" import category or some other value fulfills its statutory duty to calculate normal value as accurately as possible. See id. at 14 n.3 ("Even where a party opposing Commerce's position has submitted information

(continued...)

arguments that accompany this arbitrary "broad versus narrow" distinction, Commerce again fails to cite substantial evidence to demonstrate the superior accuracy of the import data.

**A.      Commerce's "Broad Versus Narrow" Distinction Is Arbitrary Because Commerce Failed to Determine The Category of Coal Used In Production of the Subject Merchandise**

Commerce has certain core investigatory duties, which cannot be avoided. The "best available information" standard set forth in 19 U.S.C. § 1677b(c)(1)(B) does not permit Commerce to choose between two unreasonable choices, i.e., two surrogate coal values that have an unexplained relation to the coal used by Hebei. See Anshan Iron & Steel Co., Ltd. v. United States, No. 02–00088, Slip Op. 04–121 at 13 (Ct. Int'l Trade Sept. 22, 2004) ("This court has consistently held that deference is not due an agency determination which relies upon an inadequate factual basis or is inconsistent with congressional intent."). On the contrary, the objective of establishing antidumping margins as accurately as possible "is achieved only when Commerce's choice of what constitutes the best available information evidences a rational and reasonable relationship to the factor of production it represents." Shandong Huarong Gen. Corp. v. United States, 159 F. Supp. 2d 714, 719 (Ct. Int'l Trade 2001). In Shandong Huarong, the Court affirmed on the basis of "little more than the barest support" in the record Commerce's use of an Indian HTS category for forged steel bars "that most closely reflected the type of steel imported by the respondent" because one of the respondents had imported forged steel bars. Id.

---

[3](...continued)
that ultimately proves inadequate, Commerce is not relieved of the requirement that it support its antidumping duty calculation with substantial evidence.").

at 722.  Here, there is not even a bare indication of the specific type of coal used by Hebei or by

other producers of the subject merchandise, yet Commerce nevertheless selected a surrogate coal

value.[4]

The Remand Determination failed to identify the type of coal used by Hebei or by other

producers of the subject merchandise and, even if it had done so, it failed to establish that the

coal used in the production process corresponds to the "others" Indian import value selected by

Commerce.  Commerce was not obligated to help Hebei obtain information that would allow

Hebei to add into the record a reasonable domestic surrogate coal value, but Commerce was

required to obtain adequate evidence for the value it selected.

The record does not indicate that Commerce asked Hebei explicitly to identify the

specific type and grade of the coal it uses.  See Questionnaire, attachment at sec. D, sixth page,

P.R. Doc. 16.  If some of Commerce's requests for information could be construed as requiring

specific coal information, Commerce, contrary to its statutory obligation, did not inform Hebei

that its responses were inadequate.  Section § 1677m(d) of title 19 requires Commerce to take

action in response to a party's deficient submission:  "[Commerce] shall promptly inform the

person submitting the response of the nature of the deficiency and shall, to the extent practicable,

provide that person with an opportunity to remedy or explain the deficiency in light of the time

---

[4]  In its comments to the Remand Determination, Hebei asserts that "[t]he record plainly shows that Hebei does not import its coal," but does not cite the record to support this view. Pls.' Remand Cmts. at 5.  On the other hand, Hebei correctly observes that "there is absolutely no record evidence suggesting that Indian fence post producers use imported coal in their operations."  Id.

limits established for the completion of investigations or reviews under this title." 19 U.S.C. § 1677m(d). Commerce's first supplemental questionnaire does not appear in the record, but Hebei's response and the second supplemental questionnaire indicate that Commerce requested additional information on numerous issues but not the type and grade of coal. See Letter from Grunfeld, Desiderio (Nov. 1, 2002), P.R. Doc. 88; Letter from Commerce to Grunfeld, Desiderio (Nov. 6, 2002), P.R. Doc. 92.

Contrary to Commerce's contention, Hebei's unsupported use of some, but not all, of the TERI data does not lead inexorably to the conclusion that the "others" import data is the best available information. Instead of explaining how the "others" provision relates to the coal used by Hebei, Commerce implies that it is better to use an import category that may be broader than a narrow domestic category on the theory that the broader import category is more likely to capture some of the coal types used by Hebei:

> When comparing the TERI data to that of the Indian import statistics, the Department finds that the definition of coal in the Indian import statistics indicates a value for a basket category of coal rather than grades of coal specifically selected and presented by the respondent. Thus, the Department defends its assertion that the coal value in the Indian import statistics was more appropriate for use in the Final Determination.

Remand Determ. at 11–12.

Although it may be evident that the Indian Import Statistics "others" provision is a broader category than four grades of "steam coal and rubble," it is not evident that the "others" provision even includes a type of coal comparable to that used by Hebei, nor is it evident that such coal cannot be found within the TERI data.

Hebei used only a portion of the TERI data to derive its proposed domestic coal value; it did not exhaust the domestic data in the record. In the comments to the draft redetermination, Hebei proposed that Commerce could value coal "using the prices for all grades and all types of coal contained in the TERI data." See id. at 27. Commerce apparently rejected this proposal because of the same lack of specific information: "The categories in the TERI data include domestic coal value categorized by 'steam coal and rubble,' 'slack coal and washery middlings,' and 'run–of–mine coal.' The Department has no record evidence demonstrating that any of these coal values would be more accurate than the coal value within the Indian import statistics on the record in this proceeding." Id. at 28. The Government tells the court that Hebei's proposal to derive a surrogate value by aggregating all the TERI data fails because "the TERI data sets forth over 110 potential values for coal. It is not proper to simply calculate a value from coal from all the [TERI] values." Def.'s Remand Resp. at 7. The Government provides no authority for this argument. Rather, both the Remand Determination and the Government's brief ignore the fact that "Commerce's decision to use the Indian Import Statistics suffers from the same flaw that Commerce alleges as a basis for rejecting plaintiffs' alternatives." See Shanghai Foreign Trade Enters. Co. v. United States, 318 F. Supp. 2d 1339, 1351–52 (Ct. Int'l Trade 2004).

Commerce's position is further undermined by the fact that, even if Commerce knew the specific type of coal Hebei used, Commerce would still lack sufficient record evidence to show that such coal corresponds to the "others" import statistics provision. To illustrate, Commerce stated that the "others" provision excluded "higher value coal products (i.e., anthracite, bituminous metallurgical coal)," Decision Mem. at 11, but both the HTSUS and the Indian HTS

"others" provisions seem to exclude all bituminous coal.  The Indian Import Statistics appear to use the Indian Harmonized Tariff System headings, not those of the HTSUS, as the HTSUS does not provide a subheading corresponding to 270111909.  Cf. HTSUS 2701.19.00.  HTSUS subheading 2701.19.00 encompasses "other coal," i.e., coal that is not anthracite, bituminous, or bituminous-metallurgical.  See HTSUS 2701.19.00.  Although the record does not contain any version of the Indian HTS, the current Indian HTS provides subheadings for "Anthracite coal" (2701 11 00), "Bituminous coal" (2701 12 00), and, under the 2101 19 heading for "Other coal," "Coking coal" (2701 19 10), "Steam coal" (2701 19 20), and "Other" (2701 12 90).  See India First Schedule Import–Tariff, available at http://www.cbec.gov.in/cae/customs/cs-abc.html. Neither the Government nor Hebei contends that Hebei would have used higher value bituminous metallurgical coal for the purpose of generating heat to aid in the drying of coating materials, see Decision Mem., at cmt. 4, Pls.' App., Ex. 2, at 11 (describing the role of coal in the production process), but it is not evident that no bituminous coal was used.  This raises the possibility that, if non-metallurgical bituminous coal was used in the production process, the "others" provision would not encompass it.

In sum, Commerce cannot reasonably assume that, by using the Indian Import Statistics values listed for "others coal" under article code "27011909," it was using a category of coal imports that covered the type of coal used in Hebei's production process.  A broad and unsupported coal value falls short of a substantial evidentiary basis just as a narrow and unsupported coal value does.  During its investigation or upon remand, Commerce should have established the category of coal used by Hebei or at least established the category or categories of

coal normally used to produce the subject merchandise. Commerce's failure to do so leaves no basis for favoring import data. Because Commerce drew no rational connection between its surrogate value and the coal used in production of the subject merchandise, its broad versus narrow distinction is arbitrary. See Allied Tube & Conduit Corp. v. United States, 24 CIT 1357, 1370, 127 F. Supp. 2d 207, 219 (2000) ("Commerce may not act arbitrarily . . .").[5]

### B.    Commerce's Other Explanations Fail to Overcome the Preference for Domestic Surrogate Data

In addition to the breadth-versus-narrowness explanation refuted above, Commerce prefers the "others" import provision because it is contemporaneous with the POI, contains a smaller variation between it high and low prices, derives from the same source as other surrogate values, and excludes taxes and duties. These explanations are irrelevant because Commerce failed to show that the "others" coal import category relates to the production of the subject merchandise. Assuming for the sake of argument, however, that Commerce could reasonably choose between the "others" import provision and all the TERI domestic data on the record,

---

[5] The Government cites Raoping Xingyu Foods Co., Ltd. v. United States, No. 02-00550, Slip Op. 04-111 (Ct. Int'l Trade Aug. 31, 2004), to support the proposition that the failings in Hebei's proposed surrogate coal value allow Commerce to use the Indian Import Statistics data. Raoping is distinguishable from the instant case, however. In Raoping, the Court affirmed Commerce's choice of values for "furnace oil" used by an Indian producer as the surrogate liquid fuel value. The respondent failed to supply adequate record evidence to establish the fuel oil used in its production process. Id., Slip Op. 04-111 at 9. Commerce found that the Indian furnace oil it used as a surrogate was comparable to the furnace oil used by the respondent, id. at 8.

In the instant case, Commerce made no such finding, nor would such a finding be warranted from the record. While the review in Raoping selected a fuel oil type clearly used by a comparable producer of mushrooms, here there is not record evidence that the import coal data used by Commerce corresponds to a category of coal comparable to that used by Hebei or any other producer.

these explanations are insufficient to reverse the conditional presumption in favor of domestic surrogate data. A domestic price is preferred for the calculation of surrogate values by prior practice, policy, and logic.

All else being equal, tax- and duty-free domestic data is clearly preferable over import data, but, as all things are rarely equal, this preference is subject to conditions. See Rhodia, Inc. v. United States, 185 F. Supp. 2d 1343, 1352 (Ct. Int'l Trade 2001) ("Rhodia I") ("Rhodia notes that Commerce has a stated preference for the use of the domestic price over the import price, all else being equal. This preference . . . does not require Commerce to use the domestic price in all circumstances."); see also Sulfanilic Acid From the P.R.C., 63 Fed. Reg. 63,834, 63,838 (Dep't Commerce Nov. 17, 1998) (final admin. rev.) (acknowledging that "domestic prices are preferred only if both domestic and import prices are available on a tax- and duty-exclusive basis, all else being equal."); Ferrovanadium and Nitrided Vanadium from the Russian Federation, 62 Fed. Reg. 65,656, 65,661 (Dep't Commerce Dec. 15, 1997) ("The Department has also articulated a preference for a surrogate country's domestic prices over import values.") (citation omitted). Because the paramount goal in normal value calculations is to calculate as accurately as possible the product's normal value as "it would have been if the NME country were a market economy country," the preference in favor of using domestic data does not require that domestic data be used in circumstances where it would conflict with the goal of accuracy. See Rhodia I, 185 F. Supp. 2d at 1351–52. Most notably, Commerce may select import data over domestic data where the record shows that taxes distorted the domestic price. See, e.g., Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1377–78 (Fed. Cir. 1999); Taiyuan Heavy Mach. Imp. & Exp.

Corp. v. United States, 23 CIT 701, 709–10 (1999).

Conversely, the preference for domestic data is most appropriate where the circumstances indicate that a producer in a hypothetical market would be unlikely to use an imported factor in its production process. The most obvious circumstance occurs where the import price is significantly greater than the domestic price. In Yantai Oriental Juice Co. v. United States, No. 00-07-00309, Slip Op. 02-56 (Ct. Int'l Trade June 18, 2002) ("Yantai I"), the Court concluded that, even though the import coal data might have been "more contemporaneous" and not aberrational, these considerations did not compensate for the fact that Commerce had failed to explain "how the use of seemingly more expensive imported coal data is the best available information establishing the actual costs incurred by Indian . . . producers." Id., Slip Op. 02-56 at 23. In Creatine Monohydrate from the P.R.C., 67 Fed. Reg. 10,892 (Dep't Commerce Mar. 11, 2002), Commerce found that the domestic prices, net of taxes, were "lower than or roughly equal to the import prices," which made it clear that "the domestic prices [were] not distorted by reason of high tariffs." Id. at 10,893. On this basis, Commerce used the domestic prices. Id.[6]

---

[6] The Government does not contest the existence of this preference directly. See Def.'s Remand Resp. at 6 ("Even if a presumption in favor of export data existed . . ."). Although Commerce has sometimes emphasized the preference's conditional nature, its past practice nevertheless acknowledges the existence of the preference:

> In Creatine, the Department stated that it does not have an unconditional preference for using domestic prices over import prices to value factors of productions. Further, the Department explained that it may reject domestic prices if there is evidence that the domestic prices are distorted by certain factors, such as high tariffs. If no distortion exists, the Department would use domestic prices for valuing the input.

(continued...)

In addition to being a Commerce policy in accordance with precedent, the conditional preference for domestic data is a logical starting point for achieving the objective set by Congress. In a hypothetical world of a NME country as a market economy country from which taxes, duties, and other governmental interference have been excluded, it is reasonable to assume that a domestic price reflects the value of a factor of production more accurately than an import price. This assumption may be undermined by record evidence showing how an import price more accurately reflects the actual costs incurred by a producer of the relevant product, but this must be explained reasonably by Commerce. Here, Commerce fails to establish the relative merits of the import value in terms of the actual costs incurred by a producer. Instead, Commerce's explanation—once the broad versus narrow distinction is discarded (see above)—consists of abstract data comparisons and speculation regarding the inclusion of taxes in the domestic prices.

In terms of abstract data comparisons, Commerce explained in the Final Determination that the import data is contemporaneous with the POI, which ran from October 1, 2001, through March 31, 2002. See Decision Mem., at cmt. 4, Pls.' App., Ex. 2; Notice of Initiation of Antidumping Duty Investigation: Lawn & Garden Steel Fence Posts From the People's Republic of China, 67 Fed. Reg. 37,388, 37,389 (Dep't Commerce May 29, 2002) (stating the POI). The

_____

(...continued)
Non-Frozen Apple Juice Concentrate from the P.R.C., 67 Fed. Reg. 68,987, 68,989 (Dep't Commerce Nov. 14, 2002) (final admin. rev.) (citations omitted); see also Certain Preserved Mushrooms from the P.R.C., 67 Fed. Reg. 46,173, 46,176 (Dep't Commerce July 12, 2002) (final admin. rev.) ("In Creatine, the Department explained that it may reject domestic prices if there is evidence that the domestic prices are distorted by certain factors, such as high tariffs.") (citation omitted).

Indian Import Statistics for 2001/2002 cover the period from April 2001 through December 2001, which overlaps with the POI by three months. The TERI domestic data reflects prices as of April 20, 2000, which is one year removed from the start of Indian Import Statistics' coverage. While the contemporaneity of data is one factor to be considered by Commerce, see Union Camp Corp. v. United States, 20 CIT 931, 939, 941 F. Supp. 108, 116 (1996), three months of contemporaneity is not a compelling factor where the alternative data is only a year-and-a-half distant from the POI. In addition, the Court has previously found contemporaneity to be insufficient to explain why an import price is the best available information for establishing the actual costs incurred by a producer. See Yantai I, Slip Op. 02-56 at 23.

Second, Commerce explained in the Remand Determination that the TERI data had "a greater variance of coal prices," with a 560 percent difference between the highest and lowest prices compared to a 274 percent variation in the Indian Import Statistics. Hebei observes that the variance actually favors the TERI data in absolute terms, with price range of 1,119 Rs per metric ton compared to 1,682.1 Rs for the import data. Pls.' Remand Cmts. at 4. Just as with the issue of contemporaneity, price variance is an inadequate basis to explain Commerce's surrogate value selection.

Third, Commerce claims that the selection of the import data accords with its preference "to use data which comes from the same source, where possible, for all factors of production." Remand Determ. at 29. To support its claim of past practice, Commerce cites Floor-Standing, Metal-Top Ironing Tables from the P.R.C., 69 Fed. Reg. 35,296 (Dep't Commerce June 24, 2004) (final determ.), but Ironing Tables acknowledged a past preference for using WTA Indian

Import Statistics over unofficial statistics from InfodriveIndia.com, not a past preference for using the same data source for all inputs. See id. at 35,304–05. Accordingly, this is not a valid basis for selecting the import data.

As for Commerce's speculation as to the inclusion of taxes in the TERI domestic data, the Remand Determination asserted that, because "the Department had no way of knowing whether [Indian excise and sales taxes] are included," Commerce may choose "Indian import statistics knowing that the values were free of taxes and duties." Remand Determ. at 13. Although Commerce has a clear preference for values that are tax-exclusive, see id. at 30 (citing Manganese Metal From the P.R.C., 63 Fed. Reg. 12,441 (Dep't Commerce Mar. 13, 1998) (final admin. rev.)), Commerce's position here conflicts with its statutory obligation to base its determinations on substantial evidence.

As discussed in Hebei Metals I, Slip Op. 04-88 at 15–16, federal courts have recognized Commerce's prerogative to select import data over domestic data on the grounds of tax-exclusivity only where domestic tax distortions were evident from the record. See, e.g., Nation Ford, 166 F.3d at 1377–78 ("NFC does not explain why Commerce should have used the Indian domestic price, a price admittedly distorted by the Indian tariff"); Taiyuan Heavy Mach., 23 CIT at 709–710 (citing record evidence that India "had price controls on coal," and Commerce's practice of using "import statistics when the domestic prices appeared to be governed by price controls."). The Government does not cite, nor is the court aware of, any Commerce determination adopting the Remand Determination's position that import values may be used where there is no record evidence of domestic taxes or prices that would make an imported price

more reliable than a domestic price. This is not surprising, as such a position is contrary to the statutory requirement that Commerce's determinations be supported by substantial evidence. See 19 U.S.C. § 1516a(b)(1)(B)(i).

### C.      Remand Instructions

Although Commerce claims to have done "the best it can to value coal," Remand Determ. at 30, Hebei Metals I anticipated that the record might be an inadequate basis for any surrogate coal value calculation and therefore offered Commerce the opportunity to conduct further investigations that would allow Commerce "to determine whether Indian import or domestic data provides a value that more accurately reflects the coal consumption patterns of producers in the relevant industry." Hebei Metals I, Slip Op. 04-88 at 17. Apparently, the record is devoid of such information. Commerce neglected the opportunity to correct their problem, making another remand necessary. If Commerce does not complete the investigation at this stage, the court will have no choice but to direct the use of Hebei's values, as it merely erred. Hebei did not obstruct the investigation.

On remand, Commerce shall re-open the record to add evidence. Commerce may add any relevant evidence, but it must either:

(1) seek evidence of the type of coal used by Hebei in its production process, and non-aberrational price data that best relates to this coal type, if the record does not already contain such data;

or, if that is deemed impractical at this stage,

(2) obtain evidence of the type or types of coal normally used for drying steel fence posts

in China or India and non-aberrational price data that best relates to such coal type(s), if the record does not already contain such data.

In either scenario, Commerce shall adhere to its conditional preference for domestic surrogate data or Commerce shall state that it is deviating from this practice and provide a rational explanation for doing so.

If Commerce again decides to use the "others" provision of coal in the Indian Import Statistics, it must (1) provide record evidence that this provision at least roughly corresponds to the type of coal used to dry steel fence posts; (2) determine whether the type of coal used by Hebei or a reasonably comparable type is reflected in the TERI domestic data, and (3) provide a reasonable explanation as to why the "others" import data more accurately reflects the costs incurred in producing the subject merchandise. In any event, Commerce may not support the use of import data in the surrogate coal value on the basis of tax-exclusivity if there is no record evidence to indicate that the Indian coal market prices are distorted by taxes and/or duties. Further, the other reasons thus far offered for Commerce's choice of import coal data have been found insufficient and will not sustain the choice.

## II.    COMMERCE'S CALCULATION OF SURROGATE FINANCIAL RATIOS IS SUSTAINED

The Remand Determination provides a reasonable explanation as to why Surya's internal raw consumption figure should be removed from the denominators of the SG&A and factory overhead surrogate ratios and that a reduction to the numerators was unwarranted.[7]

---

[7] Commerce uses surrogate ratios to implement the provision in 19 U.S.C. § 1677b(c)(1)(B) which requires that the normal value for products of NMEs include amounts for

(continued...)

### A.      Removal of Internal Consumption from the Surrogate Ratios' Denominators Is Reasonable and Substantially Supported

In the Final Determination, Commerce's determination as to the meaning of Surya's "internal consumption" figures was ambiguous; "internal consumption" was said to represent the production of internal assets or inter-facility transfers. Decision Mem., at 15; Pls.' App., Ex. 2; see also Hebei Metals I, Slip Op. 04-88 at 29. On remand, Commerce clarified this ambiguity by determining that "internal consumption" represented only inter-facility transfers, which would be double-counted if not removed from the expense values in the surrogate ratios' denominators.

_____

(...continued)
"general expenses and profit" in addition to the cost of the surrogate values for the factors of production. The amounts for general expenses and profit are typically obtained by applying the following surrogate ratios to the surrogate FOP values: selling, general and administrative expenses ("SG&A"), factory (or manufacturing) overhead, and profit. Shanghai Foreign Trade Enters., 318 F. Supp. 2d at 1341. These three ratios derive from the financial statements of one or more surrogate companies that produce merchandise in the surrogate country that is identical or comparable to the subject merchandise. Id. The ratios are calculated and incorporated into the normal value calculation in the following manner:

> To calculate the SG&A ratio, the Commerce practice is to divide a surrogate company's SG&A costs by its total cost of manufacturing. For the manufacturing overhead ratio, Commerce typically divides total manufacturing overhead expenses by total direct manufacturing expenses. Finally, to determine a surrogate ratio for profit, Commerce divides the before-tax profit by the sum of direct expenses, manufacturing overhead and SG&A expenses. These ratios are converted to percentages ("rates") and multiplied by the surrogate values assigned by Commerce for the direct expenses, manufacturing overhead and SG&A expenses.

Id. (citation omitted).

Because direct manufacturing expenses are a component in the denominator of each ratio, each ratio requires data for raw material costs. To this end, Commerce utilized the "Raw Material Consumed" line-item from the "EXPENDITURES" column in the Surya Roshni P&L Statement.

Remand Determ. at 21–22.

In the Remand Determination, Commerce's principal bases for its continued adherence to its surrogate ratio calculations in the Final Determination are its "accounting experience and judgment," Remand Determ. at 21, and its "accounting experience with record evidence in past cases." Id. at 33. In its brief to the court, the Government explains that, based on this accounting experience and judgment, Surya's financial statements made it "evident" that "the 'internal consumption' notation reflected components consumed internally to produce finished products (i.e., lamps and luminaries) for external sales." Def.'s Remand Resp. at 11. The Government cited prior investigations in which Commerce deducted internal consumption in order to avoid double-counting. Id. at 12 (citing Stainless Steel Sheet and Strip in Coils from Mexico, 68 Fed. Reg. 6,889 (Dep't Commerce Feb. 11, 2003) (final admin. rev.), and Structural Steel Beams from Spain, 66 Fed. Reg. 67,207 (Dep't Commerce Dec. 28, 2001) (preliminary determ.)). Despite Hebei's contention that Commerce's explanation represents nothing more than "unsupported speculation," Pls.' Remand Cmts. at 7, the court concludes that Commerce's explanation is supported by reasonable inferences from the record. In making its determination, Commerce explained what it meant by "double-counting," and this explanation accords with the discussion of internal consumption, inter-facility transfers, and double-counting in Hebei Metals I. See Hebei Metals I, Slip Op. 04-88 at 33 ("Assuming internal consumption represents intra-company transfers . . . then Commerce expressed a valid concern that the inclusion of internal consumption would overvalue raw material costs in the surrogate ratios.").

### B.     The Determination Not to Remove Internal Consumption from the Surrogate Ratios' Numerators Is Reasonable and Substantially Supported

Hebei argues that, if internal consumption is to be removed from the surrogate ratios' denominators, expenses related to internal transfers should be deducted from the SG&A and factory overhead expenses reflected in the ratios' numerators. Pls.' Remand Cmts. at 10. The Remand Determination, however, provides a reasonable explanation as to why the SG&A and factory overhead figures should be left intact.

According to Commerce, "SG&A and factory overhead expenses are not attributable to the internal raw material consumption stated on Surya's financial statements per se. Rather they should be attributed to the raw material only once." Remand Determ. at 25. Hebei understands Commerce to mean that internal transfers "were performed without incurring any factory overhead or SG&A expenses." Pls.' Remand Cmts. at 8. This is not Commerce's position. Commerce's position is that SG&A and factory overhead expenses reflect costs incurred by a company as it produces and sells its products, and such costs may come from the transfer of raw material inputs among company facilities as well as transactions involving entities outside the company. See id. at 26 ("our purpose here is to derive a ratio that allocates the entire amount of SG&A and factory overhead expense to the products produced and sold by the company to outside parties."). The Government elaborates: "Commerce did not conclude that there were no overhead or administrative costs associated with the internal transfer. Rather, Commerce found there were no 'un-captured' overhead or administrative costs . . . ." Def.'s Remand Resp. at 12. According to this logic, overhead and administrative costs associated with internal transfers were

"captured" by allocation to finished products sold to outside parties.

In describing SG&A and factory overhead costs in this manner, Commerce provides a reasonable basis for removing internal raw material expenditures from the surrogate ratios' denominators without making a corresponding adjustment to the numerators. Commerce's double-counting rationale, which supported its treatment of the denominators, does not apply to the numerators. SG&A and factory overhead expenses do not raise a double-counting concern because internally-related SG&A and factory overhead costs represent actual costs to the company. If a raw material input is transferred between two business units of a company, this may incur some actual factory overhead costs, but it will not incur any actual raw material costs because the company already owns the input. The factory overhead costs would be actual in the sense that, all else being equal, a company with a production process requiring many inter-facility transfers would incur higher factory overhead costs than to a company that makes no inter-facility transfers.

Because the Remand Determination provides a reasonable explanation as to why it is not appropriate to remove any amounts from the numerators of the SG&A and factory overhead surrogate financial ratios, Commerce's determination as to this issue is sustained.[8]

---

[8] Commerce did not address the treatment of the ratios' numerators in the Final Determination, when it offered two different explanations—production of internal assets or inter-facility transfers—for its decision to recalculate the surrogate financial ratios using Surya's raw materials consumption net of internal consumption. See Decision Mem., at cmt. 8, Pls.' App., Ex. 2, at 15. The first explanation seemed to make a strong case for removing amounts from the numerators, and the second explanation left the matter unclear.

In its briefing for Hebei Metals I, the Government did not improve the situation by taking the position that internal consumption of raw materials did not incur SG&A and factory overhead

(continued...)

**CONCLUSION**

Commerce's selection of Indian Import Statistics data for the surrogate coal value was

arbitrary and unsupported by substantial evidence.  Accordingly, the case is remanded for

reconsideration and action consistent with this opinion, and it is hereby

 ORDERED that the Department of Commerce shall file its remand determination with

the court on or before May 9, 2005;

ORDERED that Plaintiffs are granted 25 days from the date of the remand determination

to file comments; and

---

[8](...continued)
expenses.  See Def.'s Br. at 37.  Hebei Metals I demonstrated that, in at least one circumstance
(calculation of the indirect selling expenses ratio for the United States price), Commerce
attributed expenses to sales that "can be construed as a routine transfer of merchandise."  Slip
Op. 04-88 (quoting Stainless Steel Sheet and Strip in Coils from Mexico, 68 Fed. Reg. 6,889,
6,891).  Hebei Metals I also cited Fuyao Glass Industry Group Co., Ltd. v. United States, No.
02–00282, Slip Op. 03–169 (Ct. Int'l Trade Dec. 18, 2003), which, although it involves the
distinct issue of general expenses incurred by the sale of trade goods, addressed the evidentiary
problems involved in deducting amounts from the numerators of surrogate ratios.  Slip Op.
03–169 at 40.
      With the Remand Determination, Commerce has settled finally on the inter-facility
transfers/double-counting rationale for removing internal raw materials consumption from the
denominator, and has explained for the first time how the double-counting rationale does not
require an adjustment to the numerators.  This is adequate, and, because this case bears
significant factual differences from Stainless Steel Sheet and Strip in Coils from Mexico, 68 Fed.
Reg. at 6,891, it is not necessary to specifically address the methodology used in that review for
United States price as it bears on arbitrariness in the calculation of normal value here.

ORDERED that the Department of Commerce is granted 15 days to respond to any comments filed.

/s/ Jane A. Restani

Jane A. Restani
Chief Judge

Dated: This 10th day of March, 2005.
        New York, New York